RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 11a0141p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

MICHIGAN FIRST CREDIT UNION,
     *Plaintiff-Appellee/Cross-Appellant,*

          *v.*

CUMIS INSURANCE SOCIETY, INC.,
     *Defendant-Appellant/Cross-Appellee.*

Nos. 09-1925/1970

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 05-74423—George C. Steeh, District Judge.

Argued: March 9, 2011

Decided and Filed: May 24, 2011

Before: BOGGS, GRIFFIN, and KETHLEDGE, Circuit Judges.

_____

**COUNSEL**

**ARGUED:** Nancy G. Lischer, HINSHAW & CULBERTSON LLP, Chicago, Illinois, for Appellant. Don W. Blevins, McALPINE & ASSOCIATES, P.C., Auburn Hills, Michigan, for Appellee. **ON BRIEF:** Nancy G. Lischer, HINSHAW & CULBERTSON LLP, Chicago, Illinois, for Appellant. Don W. Blevins, McALPINE & ASSOCIATES, P.C., Auburn Hills, Michigan, Charles J. Holzman, Patricia D. Corkery, HOLZMAN RITTER & CORKERY, PLLC, Southfield, Michigan, for Appellee.

     GRIFFIN, J., delivered the opinion of the court, in which BOGGS, J., joined. KETHLEDGE, J. (p. 16), delivered a separate opinion concurring in all sections except for Section III.B. and in the judgment of the majority opinion.

1

—————————————

**OPINION**

—————————————

GRIFFIN, Circuit Judge.  In this action, plaintiff Michigan First Credit Union ("MFCU") filed suit against defendant CUMIS Insurance Society, Inc., asserting that CUMIS wrongfully denied its fidelity bond claim.  Following a seven-day trial, the jury found in favor of MFCU, awarding $5,050,000 in damages.  CUMIS moved for judgment as a matter of law ("JMOL") and for a new trial.  Both motions were denied, with the district court thereafter imposing an interest award of $2,730,415.  Both parties filed timely appeals.  Upon review, we affirm.

I.

MFCU is a credit union that, among other things, provides loans.  In July 2003, MFCU expanded its business to provide indirect lending, which allowed applicants to apply for loans at automobile dealerships.  Once indirect loan applications were completed, a third-party administrator compiled the applications and automatically approved low-risk loans.  Higher-risk applications were forwarded to MFCU for further review.

Two MFCU employees, Joyce Clouthier and Kathleen Batton, were responsible for the review of indirect loan applications.  To perform this responsibility, Clouthier and Batton were instructed to follow MFCU's lending policy.  This policy directed staff to make lending decisions based upon eight "key factors."  These factors were:  (1) intent to pay; (2) capacity to pay; (3) total debt; (4) escalating debt; (5) job stability; (6) assets; (7) security; and (8) any other relevant risk indicator.

According to the lending policy, "[m]anagement" was responsible for the monitoring of the indirect-lending program to ensure policy compliance.  This responsibility was allocated primarily to Michael Lewis, the vice president of lending, who was required to provide monthly reports to the MFCU board.  However, Lewis failed to monitor the indirect-lending program.

In October 2003, a quarterly internal audit was performed by Doeren Mayhew, a certified public accounting and consulting firm. A small sampling of direct and indirect loans were selected and reviewed for policy compliance. Alex Yarber, a Doeren Mayhew auditor, discovered an indirect loan he felt violated MFCU's lending policy, listing the loan as an "exception" in a report that was to be submitted to MFCU's supervisory committee. However, upon Lewis's insistence, the loan was removed from the report.

During this same time period, Hilary Clemens, MFCU's vice president of finance, became concerned about the percentage of high-risk loans being approved by the indirect-lending program. Clemens discussed her concerns with Michael Poulos, MFCU's Chief Executive Officer ("CEO"), who in turn discussed the issue with Lewis. Lewis assured Poulos that there were no problems with the indirect-lending program. Indeed, when reporting to the MFCU board, Lewis stated that he was monitoring the program and that everything "looked good."

Despite these assurances, Clemens hired Doeren Mayhew to perform another internal audit. Soon thereafter, in January 2004, a Doeren Mayhew partner met with Poulos and Lewis to discuss the results of the audit and the indirect-lending program. It was at this meeting that Lewis admitted that he had not been monitoring indirect lending. Concerned, Poulos immediately ordered a full audit. This audit indicated that the indirect-lending program had approved hundreds of loan applications in violation of the lending policy, resulting in numerous defaulted loans.

Upon learning of the substantial losses stemming from the indirect-lending program, MFCU filed its fidelity bond claim with CUMIS. CUMIS had previously issued MFCU a fidelity bond that provided coverage for losses caused by an employee's "failure to faithfully perform his/her trust." MFCU contended that it suffered financial harm as a result of Lewis's, Clouthier's, and Batton's conscious disregard of its lending

policy, entitling it to coverage. CUMIS denied the claim, resulting in the present lawsuit.[1]

Following a seven-day trial, a jury determined that MFCU's losses were covered by the fidelity bond, rendering a verdict in the amount of $5,050,000. CUMIS thereafter moved for JMOL and for a new trial. The district court denied these motions. CUMIS also moved the district court to amend the judgment to impose a specific interest amount. In response, the district court imposed a $2,730,415 interest award, holding that MFCU was entitled to penalty interest, but that such interest must be "offset" by prejudgment interest. CUMIS now appeals the judgment, and MFCU cross-appeals the district court's interest calculation.

## II.

In its first claim of error, CUMIS asserts that the evidence at trial was insufficient to demonstrate coverage under the fidelity bond's faithful-performance clause, mandating JMOL or, in the alternative, a new trial. We disagree.

We review the denial of JMOL de novo. *Anchor v. O'Toole*, 94 F.3d 1014, 1023 (6th Cir. 1996). A federal court exercising diversity jurisdiction applies the standard for JMOL used by the courts of the state whose substantive law governs the action. *Id.* "Under Michigan law, a judgment as a matter of law may not be granted unless reasonable minds could not differ as to the conclusions to be drawn from the evidence." *Ridgway v. Ford Dealer Computers Servs., Inc.*, 114 F.3d 94, 97 (6th Cir. 1997) (internal quotation marks and citation omitted). This "requires review of the evidence and all legitimate inferences in the light most favorable to the nonmoving party." *Orzel v. Scott Drug Co.*, 537 N.W.2d 208, 212 (Mich. 1995).

We review the denial of a motion for a new trial for an abuse of discretion. *Anchor*, 94 F.3d at 1021. When under diversity jurisdiction, we follow the federal

---

[1] MFCU filed suit in Michigan state court on November 2, 2005. CUMIS thereafter removed the action to the United States District Court for the Eastern District of Michigan based upon diversity jurisdiction.

standard rather than state law. *Id.* Under the federal standard, there is no abuse of discretion unless the court has "a definite and firm conviction that the trial court committed a clear error of judgment." *Id.* (internal quotation marks and citation omitted). Accordingly, we must accept "the jury's verdict if it was reasonably reached." *Id.* "[I]f the verdict is supported by some competent, credible evidence, a trial court will be deemed not to have abused its discretion in denying the motion." *Id.*

III.

This case centers on the faithful-performance clause of the fidelity bond. This clause provides: "We will pay you for your loss of covered property resulting directly from a named employee's failure to faithfully perform his/her trust." The bond further defines this language as follows:

> "Failure to faithfully perform his/her trust" means acting in conscious disregard of your established and enforced share, deposit or lending policies. "Failure to faithfully perform his/her trust" does not mean:
>
> a.      Negligence, mistakes or oversights; or
>
> b.      Acts or omissions resulting from inadequate training; or
>
> c.      Unintentional violation of laws or regulations; or
>
> d.      Unintentional violation of your policies or procedures; or
>
> e.      Acts or omissions known to, acquiesced in, or ratified by your Board Of Directors; or
>
> f.      Acts of an "employee" for which you could have made claim under Employee Or Director Dishonesty Coverage.

CUMIS contends that MFCU's losses are not covered by the faithful-performance clause because its lending policy was not "established," "enforced," or "conscious[ly] disregard[ed]." It further asserts that the loss is not covered because MFCU "acquiesced" to the policy violations at issue. Like the district court, we give these unambiguous terms their plain and ordinary meaning. *Heniser v. Frankenmuth Mut. Ins. Co.*, 534 N.W.2d 502, 504-05 (Mich. 1995).

A.

CUMIS asserts that the evidence does not support the jury's finding that MFCU's lending policy was "established." This argument is wholly without merit. The uncontradicted evidence presented at trial established that the lending policy was adopted by the MFCU board on February 20, 2001, and was still in effect at the time the relevant policy violations occurred. Nevertheless, CUMIS contends that because the lending policy's "key factors" were mere optional "guidelines," MFCU's lending policy was not "established." We disagree.

Significant evidence in the record demonstrates that MFCU's employees were required to apply the "key factors" in making all lending decisions. Indeed, the language of the policy itself indicates that consideration of the "key factors" was mandatory. Moreover, the testimony elicited at trial similarly indicates that consideration of the "key factors" was required. Accordingly, there is sufficient evidence in the record to support the jury's finding that MFCU's lending policy was "established."

B.

CUMIS next contends that the evidence admitted at trial does not support the jury's finding that MFCU's lending policy was "enforced." Once again, we disagree.

The record demonstrates that the lending policy was not an unenforced document sitting on the proverbial shelf. Indeed, Lewis was specifically tasked with monitoring the indirect-lending program to ensure lending policy compliance, and Clouthier was similarly required to ensure that indirect loans were made "in accordance with established policies and procedures[.]"[2] In addition, MFCU enforced its lending policy through training. The record establishes that Lewis, Clouthier, and Batton were all trained on the application of the lending policy and its "key factors."

---

[2]CUMIS asserts that Lewis's failure to monitor the indirect-lending program establishes that MFCU was not enforcing its lending policy. However, Lewis's failure to monitor is itself covered under the faithful-performance clause because he consciously disregarded the lending policy's requirement that he monitor the program. Testimony presented at trial indicated that Lewis was the "management" referred to by the policy as required to monitor indirect lending.

MFCU also enforced its lending policy through quarterly audits. During such audits, Doeren Mayhew associates would review a sample of loans to ensure continued policy compliance and discover non-compliant loans. In October 2003, a quarterly audit was performed that identified a non-conforming indirect loan. However, Lewis instructed the auditor to remove this loan from his report, preventing the information from being communicated to MFCU's supervisory committee. While this quarterly audit failed to uncover the policy violations at issue, the fact that this audit was performed demonstrates that MFCU actively enforced the lending policy in the indirect-lending program.

Nevertheless, despite the implementation of these enforcement mechanisms, CUMIS asserts that the lending policy was not "enforced" because such mechanisms were not effective in preventing the policy violations at issue. However, the language of the faithful-performance clause does not require a certain *level* of enforcement, or perfect enforcement, for MFCU to be entitled to coverage. Indeed, if MFCU were required to have perfect enforcement mechanisms, no covered losses would ever occur.

Moreover, the lending policy was successfully enforced in the *direct*-lending program. For example, quarterly internal audits had proven successful in discovering policy-violating direct loans. Upon learning of such violations, MFCU's standard practice was to perform a "deeper review" of the loans at issue and provide additional training. In addition, employee training had proven effective in ensuring policy compliance in direct lending. Indeed, Batton and Clouthier had received training on the lending policy, applied the policy in direct lending, and thereafter received favorable employment reviews regarding their lending decisions. Accordingly, the jury's finding that MFCU "enforced" its lending policy is supported by substantial evidence and is not unreasonable.[3]

---

[3]CUMIS also asserts that the lending policy was not enforced because it was "unenforceable." Once again, CUMIS relies on its contention that the lending policy was a set of mere optional "guidelines." However, as described above, this argument is without merit.

C.

Next, CUMIS contends that there is insufficient evidence in the record to support the jury's finding that Lewis, Clouthier, and Batton "conscious[ly] disregard[ed]" the lending policy. This argument is without merit.

The evidence establishes that Batton and Clouthier were trained on the lending policy and able to conform to its requirements. Moreover, MFCU presented evidence that numerous indirect loans were approved by Batton and Clouthier that were patently counter to policy. According to one expert, the loans were so "clearly outside of [policy] . . . [that they] would never be approved probably in any credit union." Therefore, the evidence supports the inference that such flagrant lending errors could not have been made without consciously disregarding the lending policy. *See McCombs v. Meijer, Inc.*, 395 F.3d 346, 356 (6th Cir. 2005) (noting that reasonable juries may infer conscious disregard); *First Nat'l Bank of Louisville v. Lustig*, 961 F.2d 1162, 1166 (5th Cir. 1992) (holding that reckless conduct may appropriately lead to an inference of intent). Accordingly, the jury's finding that MFCU employees "conscious[ly] disregard[ed]" the lending policy is supported by substantial evidence and is not unreasonable.

D.

Finally, CUMIS argues that the evidence does not support the jury's finding that MFCU did not "acquiesce[]" to the underlying policy violations. However, CUMIS put forth *no* evidence indicating that the MFCU board knew the violations at issue were occurring. Therefore, the record supports the jury's finding that MFCU did not acquiesce to the violations that ultimately caused its losses.

In sum, there is sufficient evidence in the record to support the jury's finding that MFCU's lending policy was "established," "enforced," and "conscious[ly] disregard[ed]." Moreover, the record evidence is sufficient to support the jury's finding that MFCU did not "acquiesce[]" to the policy violations at issue. Such findings are not unreasonable or against the clear weight of the evidence. Accordingly, we affirm the

district court's denial of CUMIS's motions for JMOL and for a new trial based upon the sufficiency of the evidence.

IV.

In the alternative, CUMIS asserts that a new trial is required as a result of several alleged trial errors. Under Federal Rule of Civil Procedure 59, a new trial is required when the original "trial [was] unfair to the moving party in some fashion[.]" *Mike's Train House, Inc. v. Lionel, L.L.C.*, 472 F.3d 398, 405 (6th Cir. 2006) (internal quotation marks and citation omitted). Here, CUMIS argues that a new trial is required because (1) MFCU made an improper "golden rule" argument during closing statements; (2) MFCU impermissibly shifted the burden of proof; (3) MFCU set forth facts during its opening statement that were not later entered into evidence; and (4) the district court wrongfully admitted two hearsay statements. We address each alleged error below.

A.

First, CUMIS asserts that MFCU made an inappropriate "golden rule" argument. During its closing statement, counsel for MFCU stated:

> There are analogies that you can bring to this case. You don't have to go very far to think of your own insurance claim.
>
> * * *
>
> I'm sure that many of you have insurance coverage or have had insurance coverage in the past, maybe homeowner's insurance or something, and sometimes there might be an occasion where somebody breaks into your house and steals something, and when that happens, you might have occasion to look at your insurance policy and say, hey was I covered? This was theft, and you might come to the conclusion yes, I think I'm covered. It says right there theft. Well, it might surprise you in response the insurance company would come out and say well, yeah, somebody stole this money from you, but on the other hand, if you had better locks on your house, they would not have been able to steal it.
>
> * * *
>
> So actually that's a cause of your loss because you didn't have good enough locks, and they might have said, well, we hired an expert, and he has come in and he said, you could have had floodlights, and that would

identified anybody coming into the house. That's a cause of your loss, and they might have said, well also, if you had not invited so many people into your house all the time, you know, asked for this. You invited people in the house all the time, and that's uncommon. So that's a cause of your loss, and they could have come up with all sorts of things that you might have done to protect yourself and your home better, and they might have employed an expert, paid him $175,000 to come up with all of these things to present to a jury and convince them psychologically that all of a sudden this is part of your insurance policy. So you should not get money back for the people that stole from the insurance company for theft of your home. That's what we have here. You have seen all of the things throughout the course the trial that Cumis has tried to suggest that [MFCU] could have done better.

CUMIS asserts that this portion of MFCU's closing statement constitutes an inappropriate "golden rule" argument because it requested the jury to put themselves in MFCU's place. We agree. *See Johnson v. Howard*, 24 F. App'x 480, 487 (6th Cir. 2001) ("Those circuits that have considered use of 'Golden Rule' arguments have 'universally condemned' them as improper because they invite decision based on bias and prejudice rather than consideration of facts."); *Whitehead v. Food Max of Miss., Inc.*, 163 F.3d 265, 278 (5th Cir. 1998) (internal quotation marks and citation omitted) ("This court has forbidden plaintiff's counsel to explicitly request a jury to place themselves in the plaintiff's position[.]").

However, despite MFCU's inappropriate argument, a new trial is not required. We "may only set aside the verdict if there is a reasonable probability that the verdict was influenced by [the improper] argument[]." *Bridgeport Music, Inc. v. Justin Combs Pub.*, 507 F.3d 470, 478 (6th Cir. 2007) (internal quotation marks and citation omitted). In making this assessment, we look at

the totality of the circumstances, including the nature of the comments, their frequency, their possible relevancy to the real issues before the jury, the manner in which the parties and the court treated the comments, the strength of the case (e.g. whether it is a close case), and the verdict itself.

*City of Cleveland v. Peter Kiewit Sons' Co.*, 624 F.2d 749, 756 (6th Cir. 1980).

In this case, MFCU's "golden rule" argument was isolated and not repeated. Moreover, there is no evidence indicating that the improper statement was made with the purpose of inflaming jury prejudice. *See United States v. Shalash*, 108 F. App'x 269, 281 (6th Cir. 2004) (holding that improper arguments made during closing statement did not require reversal when isolated and not made with deliberate intent to inflame jury prejudice).

In addition, the jury was instructed that the arguments of counsel are not evidence. Thus, any minimal amount of prejudice created by the improper argument was cured. *See Gleason v. Noyes*, 125 F.3d 855, 1997 WL 539679, at *2 (6th Cir. Aug. 29, 1997) (unpublished table opinion) (noting that improper statements made during closing statement did not warrant reversal in part because a jury instruction provided that statements of counsel are not evidence); *United States v. Smith*, 918 F.2d 1551, 1562 (11th Cir. 1990) ("Because statements and arguments of counsel are not evidence, improper statements can be rectified by the district court's instruction to the jury that only the evidence in the case be considered."). Accordingly, because there was no reversible error, a new trial is not required.

B.

Second, CUMIS asserts that the trial court erred in allowing MFCU to admit evidence regarding CUMIS's authority under the bond to inspect MFCU's policies. CUMIS contends that such references impermissibly shifted the burden of proof and misstated the evidence. This argument is without merit.

MFCU did not misstate the evidence in the record. The bond expressly provides that CUMIS "may examine and audit [MFCU's] books, records and 'premises' . . . as they relate to [the] Bond at any time." With regard to burden shifting, CUMIS asserts that references to its ability to inspect MFCU's policies impermissibly shifted the burden of proof by "suggesting that CUMIS had the obligation to govern MFCU and prevent

this situation."[4]   However, while MFCU did put forth evidence that CUMIS had the ability to inspect its policies, it never stated that CUMIS was *required* to do so.

CUMIS further argues that testimony regarding its ability to inspect MFCU's policies violated Motion in Limine Number 13.  However, CUMIS's reliance upon this limine order is misplaced, as it merely provides that MFCU could not assert that employees other than Lewis, Clouthier, and Batton had violated the lending policy.  This order does not limit MFCU's ability to establish that CUMIS had the ability to inspect MFCU's lending policy.  Accordingly, no error occurred in allowing this testimony.

## C.

Third, CUMIS asserts that prejudicial error occurred when MFCU referenced certain "checklists" during its opening statement that were not later entered into evidence.  Specifically, counsel for MFCU stated:

> In fact, when Cumis was deciding to give insurance to [MFCU], its own people had a checklist of the certain types of protections that [MFCU] had in place in determining whether to give the insurance . . . . And after Cumis completed the review and checklist, it decided to give [MFCU] the insurance that it is now seeking not to pay under.[5]

Evidence regarding these checklists was ultimately excluded.

We hold that no error requiring reversal resulted from MFCU's opening comments relating to the checklists.  Indeed, the statements at issue were made with the good-faith belief that evidence regarding the checklists would be admitted.  *See King v. Elo*, 36 F. App'x 805, 812-13 (6th Cir. 2002) (holding that good-faith reference to

---

[4] The cases cited by CUMIS in this regard are inapposite.  In *United States v. Smith*, we held that informing a jury that a criminal defendant is required to provide a reasonable explanation for incriminating evidence abrogates the presumption of innocence and impermissibly shifts the burden of proof.  500 F.2d 293, 294 (6th Cir. 1974).  In *People v. Fowler*, the Michigan Supreme Court similarly addressed the burden of proof in a criminal case.  62 N.W. 572, 574 (Mich. 1895).  Neither *Smith* nor *Fowler* is applicable to this civil matter.

[5] During its opening statement, MFCU also noted that CUMIS offered to provide continued insurance coverage to MFCU even after it denied coverage in this case.  CUMIS asserts that this statement violated Limine Order Number 7.  However, this order merely precludes the admission of evidence regarding CUMIS's "conduct in decisioning the claim."

evidence not later admitted did not deny appellant a fair trial). Moreover, any minimal prejudice caused by the opening statement was cured by the district court's jury instructions. *See United States v. Campbell*, 317 F.3d 597, 606-07 (6th Cir. 2003) (holding that reference to facts not later admitted into evidence did not deny appellant a fair trial when a curative instruction was given). Accordingly, a new trial is not warranted.

D.

Fourth, CUMIS claims that the admission of two alleged hearsay statements requires a new trial. Once again, we disagree, as neither of the challenged statements constitutes hearsay.[6]

The first challenged statement was made by Yarber, who testified that Lewis instructed him to remove a particular indirect loan from the "exceptions" section of his October 2003 audit report. This statement is not hearsay because it is a command, a verbal act without truth value. *See United States v. Rodriguez-Lopez*, 565 F.3d 312, 314-15 (6th Cir. 2009) (holding that "commands" are not hearsay because they are not "assertive speech"); *Preferred Props., Inc. v. Indian River Estates, Inc.*, 276 F.3d 790, 798 n.5 (6th Cir. 2002) (noting that "verbal acts" are not hearsay). Accordingly, the district court did not err in admitting this statement.

The second statement challenged by CUMIS was made by Poulos, who testified that Lewis did not inform him until January 2004 that he had not been monitoring indirect lending. This statement is not hearsay because it was not offered to prove the truth of the matter asserted, but to demonstrate MFCU's knowledge, or lack thereof. *See United States v. Johnson*, 71 F.3d 539, 543 (6th Cir. 1995) (holding that statements offered to prove knowledge are not hearsay). Accordingly, this statement was relevant and properly admitted.

---

[6]Hearsay is defined as a "statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801(c).

E.

Finally, CUMIS asserts that the cumulative prejudice caused by the alleged trial errors requires a new trial.  It is true that "[e]rrors that might not be so prejudicial as to amount to a deprivation of due process when considered alone, may cumulatively produce a trial setting that is fundamentally unfair." *Walker v. Engle*, 703 F.2d 959, 963 (6th Cir. 1983).  However, most of the purported errors identified by CUMIS do not constitute error in the first instance, and the relatively minor errors that did occur do not warrant reversal, even when considered cumulatively.  While the trial in this case "may not have been perfect, . . . it was fair." *United States v. Ashworth*, 836 F.2d 260, 268 (6th Cir. 1988).  Accordingly, the district court's denial of CUMIS's motion for a new trial based upon trial error is affirmed.

V.

On cross-appeal, MFCU asserts that the district court erred in holding that penalty interest, provided pursuant to Michigan Compiled Laws ("M.C.L.") § 500.2006, is to be "offset" by the prejudgment interest provided in M.C.L. § 600.6013.  We disagree.

"When deciding a diversity case under state law, a federal court must apply the law of the state's highest court." *Garden City Osteopathic Hosp. v. HBE Corp.*, 55 F.3d 1126, 1130 (6th Cir. 1995) (citing *Erie R.R. v. Tompkins*, 304 U.S. 64 (1938)).  "If, however, the state's highest court has not decided the applicable law, then the federal court must ascertain the state law from all relevant data." *Id.* (internal quotation marks and citation omitted).  "[A]n intermediate appellate court's judgment that announces a rule of law is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise." *FL Aerospace v. Aetna Cas. & Sur. Co.*, 897 F.2d 214, 218-19 (6th Cir. 1990) (internal quotation marks and citation omitted).

In this case, we hold that the district court correctly applied M.C.L. § 500.2006 in calculating the interest award.  First, the plain language of § 500.2006 requires that

penalty interest be "offset" by any other interest award: "Interest paid pursuant to this section *shall be offset by any award of interest* that is payable by the insurer pursuant to the award." § 500.2006(4) (emphasis added). Because this language "is clear and unambiguous, judicial construction is neither required nor permitted[.]" *Angott v. Chubb Group Ins.*, 717 N.W.2d 341, 348 (Mich. Ct. App. 2006) (internal quotation marks and citation omitted). Moreover, two Michigan Court of Appeals cases hold that a penalty interest award under § 500.2006 must be offset by prejudgment interest. *Id.* at 355 n.12; *McCahill v. Commercial Union Ins. Co.*, 446 N.W.2d 579, 587-88 (Mich. Ct. App. 1989). In the absence of a Michigan Supreme Court case addressing this issue, these cases are highly persuasive authority. *See FL Aerospace*, 897 F.2d at 218-19.

In asserting that an offset is not required, MFCU relies upon dicta in *Wood v. Detroit Automobile Inter-Insurance Exchange*, 321 N.W.2d 653 (Mich. 1982), a Michigan Supreme Court case addressing Michigan's No-Fault Automobile Insurance Act. However, this case is inapposite because Michigan's No-Fault Act does not have an offset provision. *See* M.C.L. § 500.3142. While *Wood* does refer to § 500.2006, it does not address the issue of offsetting. *Id.* at 662 n.17.[7] Accordingly, in light of the plain language of § 500.2006, and the highly persuasive authority provided in *Angott* and *McCahill*, we affirm the district court's interest calculation.[8]

VI.

For the reasons described above, we hold that the district court correctly denied CUMIS's motions for JMOL and for a new trial. We further conclude that the district court was correct in its interest calculation. Accordingly, we affirm the judgment of the district court in all respects.

---

[7]MFCU also relies upon *Mathis v. Encompass Insurance Co.*, No 06-CV-13837, 2008 WL 919934, at *4 (E.D. Mich. Apr. 3, 2008) (unpublished), to support its claim that penalty interest should not be offset by prejudgment interest. However, this case does not directly address the issue of offsetting. Moreover, *Mathis* possesses no precedential value in this court. *Nafziger v. McDermott Int'l, Inc.*, 467 F.3d 514, 522 (6th Cir. 2006).

[8]MFCU makes two evidentiary arguments on appeal that are relevant only if we remand for a new trial. Because a new trial will not be granted, these arguments will not be addressed.

---

**CONCURRING IN PART AND CONCURRING IN THE JUDGMENT**

---

KETHLEDGE, Circuit Judge, concurring in part and concurring in the judgment in part. In the law, to attempt a thing is generally distinct from actually doing it. In order for Michigan First to recover under the contract here, it had to show that its relevant lending policy was "enforced." The majority cites various "enforcement mechanisms" as proof of such enforcement. Maj. Op. at 7. The problem with that analysis is that the cited mechanisms were totally ineffective, as least as to Michigan First's indirect-lending program. As to that program, therefore, Michigan First has shown only that it (ineffectually) attempted to enforce the policy, not that it actually enforced it.

The parties here could have written a contract that conditioned coverage on attempted rather than actual enforcement. They did not do so, and in my view neither should we. But in this case that principle cuts both ways, since another aspect of the contract's language ultimately sinks the insurance company's position. Namely, the provision containing the "enforced" language applies not only to the indirect-lending program (where it was disregarded), but also to the direct-lending one, which is governed by the same lending policy. Per the contract's terms, then, we measure "enforce[ment]" looking at both programs, rather than at the indirect-lending program in isolation. The relevant policy undisputedly was enforced in the direct-lending program, which comprised the bulk of Michigan First's lending business. So measured, therefore, the policy was substantially enforced; and in my view that is all that the contract requires.

For these reasons, I concur in the judgment and otherwise concur in all but section III.B of the majority's opinion.